Your Honor, I'll reserve three minutes if I may, in tribute to the decoding Your Honor, which is for Peter Winkler, for the appellant. Is it music, or is it those two? Music. Music appellant, yes. So, this keeps true to the language in the deed that has been examined very closely in the Dresdner case and in the four cases, which both sides have discussed at length. And the language says, a restoration or repair is not an economically feasible one, or the bank's security would be lessened. Insurance proceeds shall be applied to the security instrument. That's what we're dealing with here. And we begin with a breach of contract claim, and we have a related claim, but that's what the heart of the matter is. So, we maintain that the bank didn't do anything to ascertain whether those two conditions were met. Let's hold aside the default for just a moment, because that presents us with a new, bigger problem. Let's talk about what happened prior to the default. And that is, we use the sentence as two conditional phrases, or half phrases, and then it has the, I guess, the non-conditional phrase. The two conditional phrases are conditions preceding to the bank's right to apply security to the security instrument. And in order for them to move forward, they have to establish that the conditions preceding occurred. So, that's why we alleged they didn't do anything to determine whether their security was impaired or lessened. They didn't do anything underground. They didn't look at the plans. Obviously, if the house was burned, there wasn't much to see there. But there was a lot you could have done to determine whether or not it was feasible to rebuild, and where their security would have been. It sounds a little stressful if I can interject, but I realize you wanted to put the breach issue to the side. But really, unless I'm missing something, we don't have to get to the technical condition precedence and the deed of trust issue if your client was in material breach, which would normally excuse performance of the bank. So, I think what I would suggest is if you could at least briefly address the significance of the breach as your default for the case first, and then go on with the other stuff. Certainly, Your Honor. Okay, so let's deal with the default. So, lenders default regularly, unfortunately. And banks offer deferment programs. They offer forbearance programs. They offer modification programs. Bank of America offered to be alleged to have made a complaint. And what Bank of America did, while Mr. Music was trying to contact them and work through their program, was to be stonewalled him. And as a result, he ended up unable to pay his mortgage and went into default. But that's the bank's doing, because the bank did not respond to his inquiries. Mr. Music did everything that a responsible homeowner should do. And in contrast to the cases that I just mentioned, Presto and Ford,  they were in default long before there was a fire there also. He was a worthless borrower. Our guy did everything he was supposed to do. And then when the fire happened, he called Bank of America and said, House is burned. I have insurance. Let's work through this. And Bank of America stonewalled him. Then he ends up in default. And it's hard for me to see how Bank of America can say here, We didn't do anything we should have done. We only communicated with you. And you ended up in default. And now we're going to take your hand. We're going to assume that it's not the bank's fault that your client was reliant on the rent and didn't come to pay their mortgage. It's not. I know that's the situation. And that's why I want the complaints to no longer happen. Well, you couldn't pay the mortgage. But it's not the bank's fault. It's just the way your client decided to structure the relationship. Well, you're absolutely right, Your Honor. It's not the bank's fault. That was my client's health and safety structure. But it was the bank's fault. They failed to communicate with him to arrange something short of foreclosure or foreclosure proceedings in default. So, in the people, as I said, people default a lot in this world, unfortunately. And when they do, they go to their lender and they say, What can we do about this? And Bank of America offered that program, as every lender does. There are a variety of programs. And they're not balanced. I mean, it would be different, I suppose, if they had some kind of a contractual agreement whereby the bank promised that if for some reason, you know, your source of credital income dries up and you're not able to pay the mortgage, we promise we will work out something with you instead of foreclosing. There's no such promise. They might make general representations about their willingness to work with barbers, but ultimately breach on their part by not, you know, coming up with some solution. You know, the contractual right to receive the mortgage payment was to their client's party owner. The bank does have an obligation to communicate with him, with the inspector as well. And when they say, we will talk to you about forbearance or modification, whatever, which they did say, and then we allege that, and that renovation did happen, and we breached, we pled, breached the covenant of good faith. Again, that's good faith is just having a conversation with the borrower whose house just burned down. And that's what the bank didn't do. So that's... Often they had supposedly had a good thing discussed and you're not giving them the release that you thought they needed to avoid default. They still defaulted, but that changes.  So if the bank had said, we're not going to give you a forbearance, he may have found an alternative source of funding at this point. He kept calling the bank and he heard, and again, we said in the complaint that the bank had said, oh, we have the program. So we're going to call you, submit the papers, because they led him down that path so that he didn't go for Swiss alternatives. And again, the bank has an obligation here to treat its customer fairly, and Bank of America did not do that. So I want to go back to my first point. If I've addressed judge Houston. Well, since they don't go down that road, they don't have nobody else. So what if Bank of America did not accommodate him, and he tried to get another accommodation, and that didn't go through, too? It would be right back to where we are now. Well, then he's out of luck. The security isn't here because Bank of America did what he's supposed to, and he wasn't able to. I'm out of my seven minutes, so I'm going to go ahead and use your first chance to answer a question. I'll ask that. So the answer is, if he would have done what he's supposed to have done in that situation, and he's out of luck. But, no, not everybody did. The bank didn't do what it was supposed to do in that situation, and the bank had an obligation to do so. I've used my seven and a half minutes. We've got time for one more question. Good morning. My name is Jason McCord, called in daily on behalf of L.A.'s Bank of America, NDA, and Back Home Love Service. I wanted to state something at the outset that I think is important to recall, because we're going to spend a lot of time talking about the default, but it's important to remember the drug sphero below granted this motion to make claims, including lack of performance, and lack of causation of damages. Those two elements were briefed in the briefs. They were in the order from the court, and they were not challenged on appeal, and this court could affirm on those claims alone. Okay, why don't we just stick with one? Let's go to the meat of it. Yes, let's do one. Maybe you could just start with, by addressing your opponent's package issue, suggestion, whatever you want to call it, and you all promised to at least talk to him. I mean, this is a pretty disparate situation, and I'm just going to ask you if you want to stumble. What's your response to that? So before my opposing counsel became involved in that case, the prior firm drafted a complaint, the original complaint, and the amended complaint, being sort of the allegations that are operative here, and they did not include any specific allegations as to, as your honors have noted, a specific contractual provision, a representation, anything anywhere saying we will forbear indefinitely while we need to work with you on this. Also. Well, a lot of you are talking about a forbearance agreement. I'm just talking about, like, having a conversation. Oh, just having a conversation. You say that you all just didn't even talk to him. So as the complaint alleges, that did happen. The complaint alleges a history of, I spoke with so-and-so on this phone, I went to this branch, they sent me to this branch. They requested this document, the fire report. They said they'd send me this document. Now, there are some allegations that documents might have been lost in the mail or that at the end of the day a forbearance was ever reached. But the conversations happened, the documents were exchanged. My client received a fire report, total destruction of the property. My client told him it's a legitimate complaint. We would investigate. And whether or not they investigated to their satisfaction, but if we're talking to answer your specific question, did the conversations occur? Yes, they did, as alleged in the complaint. That's what you just described. So I'm just looking around, well, no, I can't help you if that was transferred over to this department and that department, because I can't help you if that was transferred to that department. I think that's what is alleged in these traits. Does that matter, ultimately? I think that was more what I was interested in hearing your response to. I don't think it matters, ultimately. And just real quick on the context of what we run around, I think that it's easy to use these terms that run around and they still involve people. Let's look at the allegations and what's going on. The fire happened. There's conversations. A check is issued. Sorry, a default occurs. Two months later, a check is issued. The bank says, we need to investigate. Here's a critical fact of this story. At the time of all of this, there was a lawsuit going on. Most of these communications, particularly about this check, which is alleged to be in dispute in the lawsuit became a subject of dispute in the litigation. These communications, a lot of them are happening by attorneys. So you have Mr. Muzik's prior counsel before prior counsel, and you have Bank of America's prior counsel before me, trying to figure out what to do with this check. There is an ongoing partition action, as the court knows, in this brief. In a partition action, Muzik alleges that his co-owner's estate, so complicated, had sued him,  A partition action in California court can result in a court-ordered sale of the property, which could wipe out the value of the lender to receive back on his property. So there was a lot going on here that provides context to, yes, the conversations were happening. No, there was no stonewalling or runaround. There were people trying to get to the bottom of this. Unfortunately, we have a loan that is in permanent default status. The complaint alleges he could not make subsequent payments. That's it. That's where we're at. It's an unfortunate situation. Yeah, no, it was. Yeah. All right. You've responded at least to my question. Are there other points that you wanted to make? Well, I think it's critical that Judge Spiro did an excellent job in this case on the original complaint. He didn't leave to amend. He did an excellent job on the amended complaint, really putting a test to really prove our emotions, to sum this up. And as you read the transcript from the oral argument, it was extensive questions about, personally, I could get into every case if you want to know, just like the back of my hand. But it was Judge Spiro gave him an opportunity. How could you allege? What facts did you allege to get around this? And they were not able to do so. And that is in the transcript that is in the order, and it does boil down much to this permanent state of default. And in the contract language, which, by the way, is not a true condition, sectioned it as a, if either of these conditions exist, the bank applies the loan proceeds or the insurance proceeds to the unpaid debt. But in the case law, just looking at this, every single case that has looked at this has decided this is the lender's right. And Judge Spiro had decided anything else would be an outlier. And including Judge Sands' district in Georgia, I'm afraid, it's very faithfully affirmed that his average case was decided out of Georgia. And if you read the law in Georgia, I know we're not in Georgia, but it did do an excellent description of the policy reasons why this has to happen, why this is the case, not that it has to happen, but why it's the case. And why is it? I mean, once the RORC meets the default, the securities do not automatically interfere. Why is that exactly? There are several very interesting policy reasons. And they spread out across different counties, so I'll try to address them from Ford to California Supreme Court to potentially Everett. In Ford, the policy reason is that it sees the loan as in default, and it's non-performing. The beneficiary, which these days includes securitized trusts and pension funds, but the beneficiary is deprived of its contractual right to complete payments, which are exceptional to 3A. And it's deprived of its contractual right to foreclose on the property if it needs to. So let's just assume, I'm going to make up facts that don't have to do with this, but let's say that the value of the house in 3A disaster was a million dollars, right? And the loan that the house had in balance was less than, let's say, $300,000. And it's destroyed straight. It's sustained. The property is, in effect, worth less than the amount it holds. But everyone knows that, boy, if you get the insurance business and we build this thing, the pay would be, you know, actually better off, right? So I don't see why just because the person is in default wouldn't he still need to do an investigation to say, okay, well, if we were to get this insurance, these insurance proceeds could be in fact rebuilt to the point where the bank's security interest would be restored. And if so, why wouldn't the bank be required to apply the insurance proceeds to rebuild it? Because it seems like that's a win-win for both parties. I think that's the most logical question to ask, and the answer is twofold. If you ask why wouldn't the bank need to investigate, the first question, the first answer to look at is the contract tells the bank what happens here. The bank is not required to have an appraisal or a fessee. It specifically carves out its rights to determine if the security is impaired. Now, that is very favorably drafted to the bank, I understand, but that is the dean of trust language that we are interpreting here. So that is the first answer to the contract. It's just not required. And the second answer is there's no real win-fall to the bank here. If anything, there would be a win-fall to the borrower, which we can talk about, but there's no win-fall to the bank. Let's say the insurance is $2 million. It's where the incentive is cut. The bank is only allowed to apply the proceeds up to the unpaid balance. It immediately writes a check to the borrower. And in this case, there's no allegation that the borrower never received the check. It just held uncashed for several years. So are you saying that the fear is true? Yeah. Okay. Well, you started to say from a policy standpoint, why is this such a good rule? And that's where I stumbled a little bit. I thought it would just seem like that's not a great policy, actually, to allow the bank to just stiff the borrower and say, No, we're just going to apply the proceeds to the bank loan, and you're satisfied with it. Sorry. Yeah, I just finished the policy section. The policy, as it is spread out among several cases here before in Ninth Circuit. But then you have this interesting discussion in Woody, which is a 1964 California case. And it references a case called Alexander, which is a California Supreme Court. And what it says is that the lender has an equitable lien on the proceeds. While the borrower has title to the property, the borrower does not have title to the proceeds of the insurance. The way these contracts are drafted is that it is for the benefit of the lender is to protect a security interest. And that is how Section 5 is drafted as well in numerous places, not just this particular sentence. And the Supreme Court had noted that the benefits will be on those proceeds. Now, these are just policy reasons. We don't even have to get into that, because as far as I'm concerned, the contract is clear, the case law is clear. But it's interesting, and it makes sense. I think there's enough justification there. In the average case, not a little bit. I'll just use Georgia. To understand the context of why this makes sense. Okay. All right. Unless there are other questions. No comments. Sierra, thanks. Okay. Thanks very much for your argument. Sorry, you've got a couple of minutes left. So remodel. Yes. All right. Go ahead. So we go back to, in terms of addressing banks' right to say, hey, you're in default. We tried to keep it on default. That was the discussion we had before it sat down. And I think that's the part that the bank doesn't really want to focus on, is their failure to act in good faith. Good faith is critical, and I think that was what Your Honor was really going to. What's the greater policy goal here? The policy goal is, if people are playing nice in the sandbox, they're acting in good faith, and doing everything they should do up to this point when there's this fire, make it work. Win-win for everybody. And that's what the bank's viewpoint is. I want to go back to where I started, which was the language that we're dealing with here in Section 5 of the agreement. If restoration or repair is not economically feasible, or landless security is lessened, those are conditions of precedence, and a condition of precedence has to be satisfied by the lender. They didn't do anything to communicate or to satisfy those conditions. They did nothing. They just let Mr. Music hang out there, and he didn't do the inspection. And when he tried to keep the security from being impaired, they snowballed it. And we didn't use the word snowball, by the way. We were detailed in talking about what Mr. Music tried to do to change forbearance or a modification, or if they were going to say, no, you can't do it, then you're out of line for third party. There were lots of options, because, Your Honors, projecting on what the numbers might have been here is probably spot on, because it's San Francisco, and the value was no doubt there, particularly if insurance proceeds were applied as they ordinarily would be, the bank's security would be fully maintained, and they would be able to recover any arrearage in payments. So the bank was never at risk here, and the notion that they can ignore him and then deem their security to be at risk because he goes to the fault because people talk to him is not fair, and it should not be allowed. It should not. It should not. Thank you, Your Honor. Thank you very much, Your Honor. Jason, I'm sorry. Can you stand there?
judges: Gould, Watford, Sands